**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:17-cv-1496

PHOENIX ENTERTAINMENT PARTNERS, LLC, a North Carolina LLC,

      Plaintiff,

v.

MICHAEL T. SULLIVAN;
MTS PRODUCTIONS INC., a Colorado corporation;
J.A.C.K. GONSKA INC., a Colorado corporation; and
BROADWAYS, INC., a Colorado corporation,

      Defendants.

---

## COMPLAINT

---

The Plaintiff, Phoenix Entertainment Partners, LLC ("Phoenix"), by its counsel, complains of the Defendants, and for its Complaint alleges as follows:

## JURISDICTION OF THE COURT

1.     This is an action for copyright infringement and trademark infringement in which the Defendants stand accused, variously, of making copies of and distributing karaoke accompaniment tracks, which tracks are the subject of Phoenix's copyrights; and of using Phoenix's federally registered trademarks and service marks without authorization in the course of providing commercial karaoke entertainment services and related ancillary services; all without authorization.

2.     This action arises under §§ 32 and 43 of the Trademark Act of 1946, 15

U.S.C. §§ 1114 and 1125, as amended, as to the trademark infringement and unfair competition claims; and under § 501 of the Copyright Act of 1976, as amended, 17 U.S.C. § 501, as to the copyright infringement claims.

3.     This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

4.     This Court further has jurisdiction pursuant to 28 U.S.C. § 1338(a), in that this civil action arises under acts of Congress relating to trademarks and copyrights, and, as to the Plaintiff's federal unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark and copyright laws of the United States.

5.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because all of the Defendants reside in this State and judicial district.

6.     This Court has personal jurisdiction over each of the Defendants, based upon the Defendants' residence in this State and judicial district and conduct of significant business here, and in that the acts of which the Defendants stand accused were undertaken in this State and judicial district.

## THE PLAINTIFF

7.     Phoenix is a North Carolina limited liability company having its principal place of business in Pineville, North Carolina.

/ / /

- 2 -

## THE DEFENDANTS

8.      Defendant MTS Productions Inc. ("MTS") is a Colorado corporation that operates a mobile entertainment business, at least one purpose of which is to provide karaoke-related services.

9.      Defendant Michael T. Sullivan ("Sullivan") is an individual residing in Colorado who owns and/or operates MTS, and who personally participates in MTS's mobile entertainment business.

10.      Defendant J.A.C.K. GONSKA INC. ("Columbine") is a Colorado corporation that operates an eating and drinking establishment under the business name Columbine Lounge and Restaurant, at which karaoke entertainment is provided.

11.      Defendant BROADWAYS, INC. ("Broadways") is a Colorado corporation that operates an eating and drinking establishment under the business name Broadways Tavern, at which karaoke entertainment is provided.

12.      Together, Columbine and Broadways are referred to as "the Venue Defendants."

13.      The Defendants are joined in this action because the claims against each arise from the same series of transactions or occurrences, to wit:  a regular series of karaoke shows hosted by MTS and Sullivan at the Venue Defendants' establishments.

## BACKGROUND FACTS

14.      Karaoke is a popular form of participatory entertainment commonly found in bars and restaurants and other types of venues and at corporate events, weddings, and other parties throughout the United States.

15.     The basic premise of a karaoke show is that the venue hosting the show provides patrons with access to a sound system and specially prepared karaoke accompaniment tracks, so that individual patrons may perform for the crowd.

16.     Generally, a "karaoke accompaniment track" is an audiovisual work comprising a re-recorded version of a popular song without the lead vocals synchronized to a graphical component containing a lyric display, cueing information, and other information.

17.     When a karaoke accompaniment track is publicly performed, the graphical component is displayed to the patron who is performing and may be displayed to the crowd as well.

18.     Venues that offer karaoke entertainment, including each of the Venue Defendants, do so as part of a commercial transaction wherein the venues supply their patrons with access to karaoke tracks and karaoke entertainment services in exchange for their patronage of the establishment and the purchase of food and beverages.

19.     The purchase and consumption of alcoholic beverages in connection with karaoke shows is particularly encouraged to enable patrons to overcome inhibitions against singing in public.

20.     Most venues that offer karaoke entertainment, including the Venue Defendants, hire mobile entertainment operators, including MTS and Sullivan, to make karaoke tracks available for patrons' use and to provide karaoke entertainment services on the venues' behalf.

21.     Phoenix is the owner of SOUND CHOICE®, a federally registered trademark, in connection with which Phoenix licenses and distributes karaoke tracks

and, primarily through licensees, provides karaoke entertainment services.

22.     The SOUND CHOICE brand originated with Slep-Tone Entertainment Corporation ("Slep-Tone"), Phoenix's predecessor-in-interest.

23.     Slep-Tone grew out of its founders' original karaoke-related business, founded in March 1985, which consisted of offering recording booths at theme parks as an entertainment service.

24.     As part of that service, the company would supply recording services and SOUND CHOICE backing tracks, to which customers would sing along.

25.     As the recording booth business became popular, customers began to request copies of the backing tracks alone, a development that led the company to offer those tracks for sale.

26.     The backing track business line quickly outstripped the recording booth service, which was divested by about 1990, although Slep-Tone continued to offer and sponsor karaoke entertainment services from time to time.

27.     SOUND CHOICE was first federally registered as a trademark on February 16, 1988, for "prerecorded magnetic cassette tapes containing popular music compositions," Reg. No. 1,476,683, which is now canceled, having been superseded by a broader registration obtained in 1995.

28.     Phoenix is also the owner of CHARTBUSTER KARAOKE®, a federally registered trademark, in connection with which Phoenix distributes karaoke tracks.

29.     In 2015, Phoenix acquired the CHARTBUSTER KARAOKE brand from Piracy Recovery, LLC, which in turn acquired the brand from Tennessee Production Center, Inc., when Tennessee Production Center ceased operations.

- 5 -

30.     SOUND CHOICE-branded and CHARTBUSTER KARAOKE-branded karaoke tracks are wildly popular among karaoke entertainment providers, patrons, and home consumers.  According to some estimates, as corroborated by investigative data, more than 70% of all accompaniment tracks played at commercial karaoke shows in the United States are either SOUND CHOICE- or CHARTBUSTER KARAOKE-branded tracks, with SOUND CHOICE-branded tracks alone commanding a market share that exceeds 50%.

31.     The popularity of SOUND CHOICE karaoke tracks derives from the market's perception that the recordings are usually the most faithful to the sound of the original recording artist, a characteristic highly valued by karaoke singers.

32.     SOUND CHOICE karaoke tracks are also perceived by the market as providing highly accurate singing cues as part of the video display, a characteristic that is also highly valued by karaoke singers.

33.     Likewise, the association of the SOUND CHOICE brand with a mobile entertainment operator's karaoke business and/or with a venue's karaoke entertainment offerings confers on the operator and venue a perception in the marketplace—and among karaoke patrons—of legitimacy and professionalism.

34.     Like all karaoke tracks, SOUND CHOICE and CHARTBUSTER KARAOKE tracks are easily and frequently (though illicitly) duplicated and shared among karaoke professionals for the express purpose of making those karaoke tracks available at commercial karaoke shows.

35.     Specifically, karaoke accompaniment track users have used the available technology to place the duplicated contents of one purchased disc on two or more

computer systems for simultaneous use in karaoke shows; to place the duplicated contents of their patrons' discs on their own computer hard drives for use in karaoke shows; to "swap" song files with other users; to obtain and share karaoke tracks via file-sharing sites and torrents; to purchase computer hard drives that were pre-loaded with duplicates of karaoke tracks; and, in cases when discs were actually purchased, to sell any original media they might have owned in the secondary market once they have made copies.

36.     This distribution allows karaoke accompaniment track users to gain the benefit of using SOUND CHOICE- and CHARTBUSTER KARAOKE-branded karaoke tracks without paying for original media.

37.     To the extent that the Defendants, particularly MTS and Sullivan, have undertaken any of the activities described in the preceding paragraph, those activities have been undertaken wholly without any form of permission from or payment to Phoenix.

## THE RIGHTS OF THE PLAINTIFF

38.     Phoenix is the owner of copyright in the audiovisual works listed in Annex A hereto ("the Copyrights"), by virtue of an assignment instrument from Piracy Recovery, LLC, dated May 23, 2017.

39.     As the owner of the copyright in the audiovisual works, Phoenix has the exclusive rights, *inter alia*, to reproduce the works in copies; to distribute copies of the works to the public by sale or other transfer of ownership, or by rental, lease, or lending; and to perform the works publicly.

40.   Each of the claims of copyright in the audiovisual works identified in Annex A was registered with the United States Copyright Office prior to the commencement of this action, prior to the discovery by Phoenix of the Defendants' acts of copyright infringement, and prior to the commencement of the Defendants' acts of copyright infringement.

41.   The audiovisual works are the subject of separate copyright from the copyright in the underlying musical compositions they embody.

42.   Phoenix is the owner of the federal service mark registrations listed in Annex B hereto ("the Sound Choice Marks"), by virtue of an assignment instrument from Slep-Tone dated February 15, 2015.

43.   Slep-Tone acquired its rights in the Sound Choice Marks by virtue of its registrations based on use of the marks in connection with the sale of karaoke accompaniment tracks from as early as 1987 and in connection with the advertising and performance of karaoke entertainment services, directly from the 1980s onward and by related companies that include hundreds of controlled licensees from 2007 onward.

44.   Phoenix and its predecessor have, for the entire time the Sound Choice Marks have been federally registered, provided the public, including the Defendants, with notice of those federal registrations through the consistent application of the symbol ® to its marks in connection with its goods and services, when appropriate.

45.   Principally, the Sound Choice Marks are indicators of Phoenix as the origin of karaoke entertainment services provided in connection with the Sound Choice Marks.

46.   Among other things, Phoenix is in the business of licensing the Sound

Choice Marks for karaoke entertainment services provided to patrons of commercial customers.

47.     The right to display the Sound Choice Marks in connection with commercial karaoke shows requires karaoke operators to acquire a license from Phoenix.

48.     Phoenix's licensing programs all require the operator to expend thousands of dollars, with the exact amount depending on the specific licensing arrangement selected.

49.     Phoenix's licensing programs also require the operator to submit to quality control procedures Phoenix has established for the purposes of protecting its Sound Choice brand.

50.     Phoenix and its predecessor have entered into more than 500 license agreements for the Sound Choice Marks with commercial karaoke operators in the United States, Canada, Mexico, Australia, and New Zealand.

51.     Phoenix is also the sole owner of Sound Choice Entertainment, LLC, a Texas limited liability company ("SCE") that is engaged in the business of providing karaoke entertainment services to venues in various locations around the United States, and which is preparing to enter the Colorado market.

52.     Phoenix is the owner of the federal service mark registration listed in Annex C hereto ("the Chartbuster Karaoke Mark"), by virtue of an assignment instrument from Piracy Recovery, LLC dated November 10, 2015.

53.     Piracy Recovery, LLC obtained the Chartbuster Karaoke Mark by virtue of an assignment instrument from Tennessee Production Center, Inc. dated April 18, 2012.

54.     Tennessee Production Center acquired its rights in the Chartbuster Karaoke Mark by virtue of its registration based on use of the mark in connection with the sale of karaoke accompaniment tracks from as early as 1989.

## THE ACTIVITIES OF THE DEFENDANTS

**A.     MTS and Sullivan**

55.     MTS and Sullivan operate a mobile entertainment business through which they provide karaoke entertainment services to their venue customers and other customers.

56.      In order to supply karaoke entertainment services to a venue, MTS and Sullivan prepare and execute a karaoke show, either themselves or through one or more persons in their employ, by acquiring, or acquiring access to, appropriate sound equipment for playing karaoke accompaniment tracks; connecting the sound equipment to a source for karaoke accompaniment tracks; causing selected karaoke accompaniment tracks to be played over the sound equipment; encouraging the venue's patrons to participate in the show; controlling the organization and flow of the performances; and acting as the on-microphone emcee of the show.

57.     During the course of supplying these karaoke entertainment services, MTS and Sullivan repeatedly display the Sound Choice Marks in connection with the services, often dozens of times over the course of a typical four-hour karaoke show.

58.     Because of the well-known association of the Sound Choice Marks with karaoke entertainment services, the display of the Sound Choice Marks in connection with the services, regardless of the particular song being played, acts as a general

advertisement for the services as well as an indicator of the quality of the services being provided.

59.     Because of the frequent, repeated display of the Sound Choice Marks across numerous instances of widely disparate songs, patrons and other consumers of MTS and Sullivan's karaoke entertainment services are likely to view the display of the Sound Choice Marks as an indicator of the affiliation, connection, or association of MTS and Sullivan with Phoenix, or of Phoenix's sponsorship or approval of their services and related commercial activities, rather than merely as the creator of the underlying communicative content of any particular song being performed.

60.     When MTS and Sullivan made the unauthorized copies of SOUND CHOICE-branded karaoke tracks that they use to provide karaoke entertainment services, they were not required, on any technological level, also to copy the Sound Choice Marks.

61.     Nevertheless, MTS and Sullivan affirmatively chose also to copy the Sound Choice Marks when copying the tracks they used, in part because of an intent to trade upon the business goodwill associated with the Sound Choice Marks.

62.     The foregoing activities undertaken in connection with the Sound Choice Marks were undertaken in derogation of Phoenix's rights in the Sound Choice Marks.

63.     MTS and Sullivan's services, as undertaken in connection with the display of the Sound Choice Marks, were also therefore counterfeit.

64.     Consumers of MTS and Sullivan's services are likely to be confused regarding the affiliation or connection of MTS and Sullivan with Phoenix, based on their mistaken belief that the services being provided are provided with Phoenix's knowledge

and approval.

65.     As a result of those activities, Phoenix has been damaged through the loss of revenues associated with the sale or licensing of legitimate services, as well as through the loss of Phoenix's ability to control the quality of services provided in connection with the Sound Choice Marks.

66.     MTS and Sullivan copied the audiovisual work(s) identified in Annex A, the copyright in which belongs to Phoenix.

67.     When they copied the aforementioned audiovisual works, MTS and Sullivan marked those copied tracks with the Chartbuster Karaoke Mark.

68.     MTS and Sullivan distributed the copies they made of the audiovisual work(s) identified in Annex A, and marked with the Chartbuster Karaoke Mark, to patrons of the venues where they provided karaoke entertainment services, by making those copies available for use and for public performance by patrons.

69.     MTS and Sullivan also caused the audiovisual work(s) identified in Annex A to be publicly performed at at least one venue where they provided karaoke entertainment services.

70.     MTS and Sullivan did not have Phoenix's permission to make or acquire the copies, to mark the copies with the Chartbuster Karaoke Mark, to distribute the copies to the patrons, or to publicly perform the audiovisual works.

71.     MTS and Sullivan's acts of reproduction, distribution, and public performance of the audiovisual works were undertaken in derogation of Phoenix's exclusive rights in those audiovisual works.

72.     MTS and Sullivan's acts of marking the copied tracks with the Chartbuster

Karaoke Mark were undertaken in derogation of Phoenix's right to control the use of those marks.

73.     As a result of those unauthorized acts of reproduction, marking, distribution, and public performance, Phoenix has been damaged.

74.     Phoenix believes that MTS and Sullivan's acts of copyright infringement are not limited to the work(s) identified in Annex A, but that those acts extend to many such works in which Phoenix owns the copyright, and that discovery will reveal the extent of that infringement.

**B.     The Venue Defendants' Infringement of the Sound Choice Marks**

75.     Each of the Venue Defendants hosts karaoke shows comprising karaoke entertainment services at its establishment.

76.     At these karaoke shows, each Venue Defendant supplies karaoke entertainment services to its patrons by contracting with an operator, in this case MTS, as its agent for doing so.

77.     As the patrons are supplied with karaoke entertainment services, the Sound Choice Marks are repeatedly displayed in connection with the services.

78.     Because of the well-known association of the Sound Choice Marks with karaoke entertainment services, the display of the Sound Choice Marks in connection with the services, regardless of the particular song being played, acts as a general advertisement for the services as well as an indicator of the quality of the services being provided.

79.     Because of the frequent, repeated display of the Sound Choice Marks across numerous instances of widely disparate songs, patrons who receive karaoke

entertainment services from each of the Venue Defendants are likely to view the display of the Sound Choice Marks as an indicator of the affiliation, connection, or association of the particular Venue Defendant with Phoenix, or of Phoenix's sponsorship or approval of the services and related commercial activities, rather than merely as indicating Phoenix as the creator of the underlying communicative content of any particular song being performed.

80.     The foregoing activities undertaken in connection with the Sound Choice Marks were undertaken in derogation of Phoenix's rights in the Sound Choice Marks.

81.     Each Venue Defendant's patrons are likely to be confused regarding the affiliation or connection of that Venue Defendant with Phoenix, based on their mistaken belief that the services being provided are provided with Phoenix's knowledge and approval.

82.     As a result of those activities, Phoenix has been damaged through the loss of revenues associated with the sale or licensing of legitimate services, as well as through the loss of Phoenix's ability to control the quality of services provided in connection with the Sound Choice Marks.

83.     The karaoke entertainment services each Venue Defendant provides to its patrons are an essential part of a commercial transaction wherein the patrons purchase food and beverages and receive access to the services in connection with their patronage, even if the patrons do not directly pay for access to the services.

84.     When the karaoke shows are ongoing, the shows are generally the principal entertainment focus of the Venue Defendant's establishment.

85.     Each Venue Defendant derives value from these karaoke shows in the

form of increased patronage and increased sales of food and beverages.

86.     Upon information and belief, each Venue Defendant has advertised the availability of karaoke shows on its premises, via its own advertising apparatus and as an activity attributable to its business, rather than as adjunct or auxiliary to its business.

87.     Each Venue Defendant has had actual knowledge of the foregoing activities being undertaken at its establishment.

88.     Specifically, Columbine was notified by Phoenix by a letter dated March 24, 2017, and delivered as early as March 27, 2017, of the unlicensed, infringing character of the karaoke entertainment services being provided in its establishment.

89.     Broadways was notified by Phoenix by a letter dated August 3, 2016, and delivered as early as August 8, 2016, of the unlicensed, infringing character of the karaoke entertainment services being provided in its establishment.

90.     In the letter, each Venue Defendant was offered information about licensing and compliance programs that Phoenix offers to venues that feature karaoke entertainment, along with the opportunity to bring their karaoke entertainment services into compliance with the law and with Phoenix's policies regarding the use of its intellectual property.

91.     In particular, each Venue Defendant was offered the opportunity, at no charge, to request, via Phoenix's Safe Harbor program, that Phoenix evaluate the licensing status and needs of its karaoke entertainment provider and to avoid liability as long as the Venue Defendant took heed of Phoenix's evaluation and acted accordingly.

92.     None of the Venue Defendants took advantage of the Safe Harbor program.

93.     Despite these offers, and despite their knowledge of the unlicensed, infringing character of the karaoke entertainment services being provided in their establishments, the Venue Defendants elected not to bring their karaoke entertainment services into compliance.

94.     In particular, each Venue Defendant has the right to control whether or not the activities occur on its premises.

95.     As noted previously, each Venue Defendant had specific knowledge of its agents' direct infringement of the Sound Choice Marks.

96.     Despite this knowledge, each Venue Defendant continued to use those agents to commit direct infringement of the Sound Choice Marks during the course of providing karaoke entertainment services to its patrons.

97.     Each Venue Defendant has the right to control the means and the details of the process by which MTS and Sullivan accomplish their respective tasks, including, without limitation, controlling the dates and starting and stopping times of shows, determining whether particular content (such as offensive-language content) is permitted to be played at shows, determining the style and genre of music played at shows, and determining whether MTS and Sullivan are permitted to use the venue's equipment (such as television displays, sound equipment, stage, etc.) as part of the shows.

98.     Each Venue Defendant consented to an arrangement by which MTS and Sullivan would provide karaoke entertainment services on its behalf and subject to its control, and MTS and Sullivan likewise consented so to act.

99.     Despite their knowledge of the infringing character of the activities and ability to control whether those activities occur, the Venue Defendants each elected not

to stop the infringement from occurring.

100.    As such, to the extent that they are not directly liable as an infringer, each of the Venue Defendants is liable as a secondary infringer for the continuing infringement that has occurred and is occurring on its premises.

**C.    The Venue Defendants' Copyright Infringement**

101.    As noted above, MTS and Sullivan committed copyright infringement of each of the audiovisual works identified in Annex A by copying, distributing, and publicly performing the work(s) without a license to do so.

102.    Specifically, MTS and Sullivan distributed copies of the audiovisual work(s) by making those works available for public performance at karaoke shows.

103.    MTS and Sullivan distributed copies of the audiovisual works on each of the Venue Defendants' premises.

104.    Additionally, MTS and Sullivan publicly performed the audiovisual works on Columbine's premises.

105.    As detailed above, each of the Venue Defendants has the right and ability to supervise the distribution (and, where applicable, the public performance) of karaoke tracks on its premises.

106.    Also as detailed above, each of the Venue Defendants has a financial interest in making the audiovisual work(s) available at its establishment—to wit, the entertainment of its paying customers as an inducement to their patronage of the establishment.

107.    Indeed, each of the Venue Defendants has a particular interest in making

the broadest number of tracks available to its patrons, because a patron who wishes to sing a particular track will be inclined to patronize some other establishment that makes that track available if the Venue Defendant does not.

108. As such, each of the Venue Defendants is vicariously liable for MTS and Sullivan's acts of copyright infringement of the work(s) identified in Annex A, which acts occurred on its premises, including both distribution and public performance where applicable.

### D.    The Defendants' pattern of infringing conduct

109. The Defendants' conduct as described above with respect to the Sound Choice Marks and, as applicable, to Phoenix's copyrights and the Chartbuster Karaoke Mark, extends as part of a large-scale program of infringing activities and piracy.

110. Essentially, the Defendants have built an entire business model and moneymaking scheme premised on a competitive advantage derived from the infringement of the intellectual property rights of others, including Phoenix.

111. The Defendants' activities directly compete with Phoenix's own licensees and Phoenix's wholly owned subsidiary company, SCE, by using identical but unauthorized trademarks in connection with services that are neither authorized nor subject to Phoenix's quality control.

112. The Defendants' wrongful conduct exerts illegitimate and unfair pressure upon the market for karaoke services in this State and judicial district through the unlicensed use of pirated material belonging to Phoenix, thereby diminishing the value of licenses and permissions in the hands of Phoenix, its subsidiary, and its licensees.

113.    The diminution of the value of licenses encourages or forces karaoke operators to forego licenses in order to compete profitably.

114.    Upon information and belief, the Defendants' misconduct has cost Phoenix in excess of $100,000 in revenue from legitimate sources crowded out of the market by their wrongful conduct.

## FIRST CLAIM FOR RELIEF
## TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114(1)

115.    Each Defendant used a reproduction, counterfeit, or copy of the Sound Choice Marks in connection with the provision of services including karaoke services, by repeatedly displaying a reproduction, counterfeit, or copy of the Sound Choice Marks during the provision of those services.

116.    Defendants MTS and Sullivan used a reproduction, counterfeit, or copy of the Chartbuster Karaoke Mark in connection with the distribution of goods including karaoke accompaniment tracks, by copying karaoke accompaniment tracks, marking the tracks with the Chartbuster Karaoke Mark, and transporting the marked tracks in commerce in order to supply those tracks to patrons at the Venue Defendants' establishments.

117.    Each Defendant's use of the Sound Choice Marks and, as applicable, the Chartbuster Karaoke Mark, was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

118.    Phoenix did not license any Defendant to use the Sound Choice Marks or the Chartbuster Karaoke Mark in connection with the provision of their goods or services.

119.     Each Defendant's use of the Sound Choice Marks or, as applicable, the Chartbuster Karaoke Mark, is likely to cause confusion, or to cause mistake, or to deceive its customers and patrons into believing that the goods and services being provided are provided with the authorization of Phoenix.

120.     Each Defendants' use of the Sound Choice Marks in connection with their karaoke entertainment services infringes both the "goods" Sound Choice Marks and the "services" Sound Choice Marks because karaoke entertainment services are within the zone of natural expansion of Phoenix's karaoke accompaniment track business.

121.     Each Defendant's acts were willful, knowing, and intentional.

122.     Each of the Venue Defendants is additionally vicariously or contributorily liable for the acts of that agent that infringe the Sound Choice Marks or the Chartbuster Karaoke Mark.

123.     Each Defendant's activities therefore constitute the infringement of the federally registered Sound Choice Marks and/or the Chartbuster Karaoke Mark in violation of 15 U.S.C. § 1114(1).

124.     Phoenix has been damaged by each Defendant's infringing activities.

125.     Unless enjoined by the Court, each Defendant's infringing activities as described above will continue unabated and will continue to cause harm to Phoenix.


**SECOND CLAIM FOR RELIEF**
**UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)**

126.     Each Defendant has supplied karaoke entertainment services to customers or patrons, in connection with which the Sound Choice Marks were used in the advertising and performance of the services and not merely as an adjunct to the

playing of any particular communicative content contained within karaoke accompaniment tracks.

127.    The use of the Sound Choice Marks is likely to cause confusion, or to cause mistake, or to deceive the customers or patrons into believing, falsely, that Phoenix approved the Defendant's services and commercial activities.

128.    Because of each Defendant's wholly unauthorized uses of the Sound Choice Marks in the manner described above, Phoenix was denied revenue from the sale or licensing of authorized services and deprived of control over the use of the Sound Choice Marks.

129.    Because Phoenix has been denied this revenue and control, it has been damaged by each Defendant's uses.

130.    Phoenix is a provider of karaoke entertainment services, directly, through controlled licensees, and through its wholly owned subsidiary SCE.

131.    Each Defendant's activities are part of a program and money-making scheme premised upon the provision of unlicensed karaoke entertainment services undertaken in connection with the Sound Choice Marks.

132.    Each Defendant's activities in furtherance of this program of infringement have caused a competitive injury to Phoenix, both directly and on the basis of damage to SCE and to Phoenix's licensees.

133.    Each Defendant's activities constitute unfair competition in violation of 15 U.S.C. § 1125(a).

134.    Unless enjoined by the Court, each Defendant's unfair competition activities as described above will continue unabated and will continue to cause harm to

Phoenix.

### THIRD CLAIM FOR RELIEF
### COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. § 501

135.   Phoenix's copyright(s) in the audiovisual work(s) listed in Annex A are valid and subsisting.

136.   MTS and Sullivan reproduced or caused to be reproduced each of the works listed Annex A, in violation of Phoenix's exclusive rights, without Phoenix's permission.

137.   MTS and Sullivan additionally made those unauthorized copies of the work(s) available to venue patrons for use, thereby distributing the works in violation of Phoenix's exclusive rights, without Phoenix's permission.

138.   MTS and Sullivan additionally caused or permitted the work(s) to be publicly performed, in violation of Phoenix's exclusive rights, without Phoenix's permission.

139.   Each of the Venue Defendants permitted MTS and Sullivan's acts of distribution to occur on its premises.

140.   Columbine additionally permitted MTS and Sullivan's acts of public performance to occur on its premises.

141.   Each Venue Defendant had the right and ability to supervise MTS and Sullivan in the activities that constituted direct copyright infringement on the part of MTS and Sullivan.

142.   Each Venue Defendant had a financial interest in the acts of distribution that constituted direct copyright infringement on the part of MTS and Sullivan.

143.    Columbine additionally had a financial interest in the acts of public performance that constituted direct copyright infringement on the part of MTS and Sullivan.

144.    As such, each Venue Defendant is vicariously liable for that copyright infringement.

145.    Each Venue Defendant had actual knowledge of the copyright infringement occurring on its premises.

146.    Each Defendant's acts as identified above constitute knowing, and therefore willful, infringement of Phoenix's copyright in the subject audiovisual work.

147.    As a result of these acts of infringement, Phoenix has been damaged.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Phoenix prays for judgment against each of the Defendants severally, and that the Court:

A.    Find that each Defendant has committed acts of infringement, including but not limited to counterfeiting, of the federally registered Sound Choice Marks and the federally registered Chartbuster Karaoke Mark, in violation of 15 U.S.C. § 1114(1);

B.    Find that each Defendant has engaged in unfair competition detrimental to Phoenix in violation of 15 U.S.C. § 1125(a);

C.    Find that each Defendant has committed acts of infringement of works in which Phoenix owns the copyright, in violation of 17 U.S.C. § 106;

D.    Enter judgment against each Defendant and in favor of Phoenix on all applicable counts;

E.      Award to Phoenix each Defendant's profits and the damages sustained by Phoenix because of that Defendant's conduct in infringing the Sound Choice Marks or the Chartbuster Karaoke Mark or both, or, in the alternative, statutory damages per trademark infringed by counterfeiting, and in any event in an amount not less than $50,000 per Defendant;

F.      Award to Phoenix each Defendant's profits and the damages sustained by Phoenix because of that Defendant's acts of unfair competition under 15 U.S.C. § 1125(a);

G.      Award to Phoenix statutory damages for the acts of copyright infringement, pursuant to 17 U.S.C. § 504, if available, or actual damages, if not;

H.      Award to Phoenix treble, punitive, or otherwise enhanced damages, as available, upon a finding that any Defendant acted willfully in the conduct of its infringement;

I.      Grant Phoenix preliminary and permanent injunctive relief against further infringement of the Sound Choice Marks and the Chartbuster Karaoke Marks, further false designations of origin, and further infringement of Phoenix's copyrights by each Defendant;

J.      Award Phoenix its costs of suit and attorney's fees, to the extent not awarded above; and

K.      Grant Phoenix such other and further relief as justice may require.

/ / /

Respectfully submitted this the 20th day of June, 2017.

s/ James M. Harrington
James M. Harrington
Phoenix Entertainment Partners, LLC
610 Old Campbell Road, Suite 112
Richardson, TX 75080
Telephone: (214) 396-7288
E-mail: jim@phxep.com
Attorney for Plaintiff
Phoenix Entertainment Partners, LLC

## ANNEX A

### COPYRIGHT REGISTRATIONS

| Subject Work | Style of Artist | © Reg. No. |
|---|---|---|
| Blue | LeeAnn Rimes | SR0000367547 |

## ANNEX B

### SOUND CHOICE FEDERAL TRADEMARK REGISTRATIONS

**Reg. No.      Mark                                                    Reg. Date**
**Goods/Services**

1,923,448    SOUND CHOICE                              October 3, 1995
pre-recorded … compact discs containing musical compositions and compact discs
containing video related to musical compositions

2,000,725    SOUND CHOICE & Design (see below)        September 17, 1996
pre-recorded … compact discs containing musical compositions and compact discs
containing video related to musical compositions

4,099,045    SOUND CHOICE                              February 14, 2012
Conducting entertainment exhibitions in the nature of karaoke shows

4,099,052    SOUND CHOICE & Design (see below)        February 14, 2012
Conducting entertainment exhibitions in the nature of karaoke shows


"SOUND CHOICE & Design" refers to the following display mark:



### ANNEX C

**CHARTBUSTER KARAOKE FEDERAL TRADEMARK REGISTRATIONS**

**Reg. No.     Mark                                         Reg. Date**
**Goods/Services**

3,660,592     CHARTBUSTER KARAOKE & Design (see below)   July 28, 2009
Computer storage devices, namely, flash drives; DVDs featuring a variety of music;
Flash memory card; Pre-recorded CDs featuring a variety of music and graphics.

